Good morning, everyone. Nice to see a packed courtroom this summer day. We're going to begin with our only case this morning, which is Appeal Number 25-3127, Rojas v. Olson. Nope. Yep. That one. And we will welcome to the podium Ms. Goh. You'll have to help me with the pronunciation of your name when you're ready. May it please the Court, my conego for Petitioner Appellant, Mr. Sirius Rojas. I'd like to reserve four minutes for rebuttal, and I'd like to start with three points. First, the government's new detention policy violates the statute. Section 1226 governs detention of noncitizens living in the country like Petitioner and allows for their release on bond, while Section 1225b-2 mandates detention for noncitizens seeking admission into the country at the border and ports of entry. This follows from the text, context, history, nearly three decades of practice, and it is consistent with what the Supreme Court and Solicitor General said in Jennings. And the government tries to resist canon after canon of statutory construction, but as the Second, Sixth, and Eleventh Circuits have held, Petitioner's interpretation is the most faithful to the text and harmonizes both statutes. Second, it makes sense why Congress preserved bond for people like Petitioner, who has lived here for nearly eight years, has a young U.S. citizen daughter, and has no criminal history. Congress sensibly decided to preserve discretion so that the agency is not forced to use limited resources, locking up those who are least likely to pose any flight risk or danger. And that leads to my third point, that Congress does not hide elephants in mouse holes. The government claims that 30 years ago, Congress adopted the largest detention mandate in the history of this country, and that somehow escaped the notice of five administrations, the Supreme Court, and 15 Congresses since. But we know that's not what Congress did based on how it treated mandatory detention in Ira-Ira. It was so concerned about the strain from the detention mandate that it did adopt at 1226C for so-called criminal aliens, that it delayed implementation by two years and made the agency add just 500 beds. And the government cannot account for how the same Congress would have said nothing about a new mandate at 1225B2 that would have been orders of magnitude greater, sweeping up to two million people then and six million people now. That's not what Congress did, and this court should reject the government's attempt at rewriting the statutes. Now, I would like to start, if there are no questions. Could you touch on mootness? I understand the parties and their supplemental briefing to be arguing that there's a lot of controversy because there is a disagreement over 1225 and 1226, and I understand that. But walk me through how a judgment in the Habeas case is going to provide relief for your client. Yes, Your Honor. As you pointed out, the parties agree there's a lot of controversy. We still dispute what is the appropriate detention authority for a petitioner. And in his Habeas petition, he also set a declaration as to what the appropriate detention authority is for him. I think it's helpful to step back and just remember the facts of this case and how we got here. So the district court denied the Habeas petition, finding that he was subject to 1225B2. We appealed, and in the interim during briefing, a separate district court vacated the BIA decision, Yojair Hurtado, for a brief moment during which the immigration judge held a bond hearing, found he was not a flight risk or danger, and ordered his release. However, Yojair Hurtado has now been restored because that other district court decision has been stayed, and the government has appealed the bond grant. So as the parties made clear in their briefing, it's not a matter of if but when the board will reverse the bond grant. And thus, Mr. Ciros Rojas faces imminent redetention, and the Supreme Court has explained clearly in pre-op that even if somebody has been released pending an appeal, so long as a court can grant permanent relief, and here it would be a declaration as to what detention authority applies to him, then the case is not moot. So returning to 1226, petitioner falls squarely within that statute. He was arrested on a warrant, and he is detained pending removal proceedings. The government claims that 1226 does not apply to those who have been, who are not admitted, but that's just contrary to the text. As the 2nd and 11th circuits explained, 1226 covers both people who are admitted and unadmitted. The previous statute provided for detention pending a decision on deportability, but in IRA-IRA, Congress changed people who enter inspection from deportable to inadmissible, and at the same time, it changed the language of this bond-eligible statute from a decision on deportability to one on removal. And Congress would not have had to make that change if it meant to limit 1226 to only people who've been admitted. And if there are any doubt about that, you only need to look at the neighboring provision, section 1226C, which carves out some people on inadmissibility grounds. That's at 1226C1A and D, which were enacted at the same time as IRA-IRA, as well as 1226C1E, enacted just last year, specifically targeting some people who enter without inspection. And Congress would not have to carve out some inadmissible people unless they otherwise fell within 1226A. If there are no further questions on 1226, I'll be glad to move on to 1225B2. As you all know, the government argues that all applicants for admission, by being deemed applicants for admission, are necessarily also seeking admission. But that's contrary to the text of the statute. Petitioner does not fall within 1225B2 because that statute imposes a separate condition for those who are seeking admission. So you need to check both boxes of being both an applicant for admission and seeking admission in order to be covered under mandatory detention there. The seeking admission clause of that section is a carryover from the previous statute. The prior statute used the term entry rather than admission. So it looks like that part of the statute is essentially the same as the prior statute, as amended by AEDPA, just a few months before IRA-IRA. And the only change to that part of the statute was to substitute the word admission for entry. Is that a correct statement? Am I understanding the statutory history correctly here? Not precisely, Your Honor. So the prior 1225 did have language requiring officers to inspect all aliens who were seeking admission, readmission, or transit. And then the subset of that, who were not clearly and beyond doubt admissible, could be subject to mandatory detention. So we actually think Congress was intentional when it kept this phrase seeking admission and put it into 1225B2 and brought with it the old soil of referring to somebody who is committing the act of approaching the border from the outside and seeking an authorized entry into the country. Well, that's what I'm trying to understand here because it looks like the substitution of the concept of admission for entry should have some meaning in the interpretation of the statute. And so perhaps you can help me with that. Because the concept of admission was changed in that what it refers to, or the concept, the distinction between immigrants entering at the border and immigrants who are already here but have not lawfully been admitted was a primary focus of Congress in ERIRA in amending this whole statutory scheme. And that distinction was eliminated for purposes of grounds for removal and for purposes of the procedural components of the system, who has the burden of proof, what the standard is, etc., for removing unadmitted aliens who illegally entered the country. And your argument is that this phrase seeking admission, an alien seeking admission, carves out an exception to that approach of treating aliens who have entered illegally without admission for purposes of only the detention question, not for all the other purposes, but just the detention question. Yes, Your Honor. I think there was a lot packed in there, so I hope to address all parts of your question. So first, admission still includes the reference to a lawful entry. So Congress did not do away with the relevance of entry. That's still part of the definition of admission. And second, at the same time that it changed 1225b2 to focus on those applicants for admission who are seeking admission, it also adopted the neighboring provision, 1225b1, which is the expedited removal scheme. And there, Congress had no regard for whether or not someone is seeking admission or not. That covers all aliens who are arriving or who have entered without inspection and have not been here for more than two years. So that was the extraordinary step that Congress gave to the executive to deal with recent border crossers. And then third, I think Your Honor was asking about the sea change that happened with IRA-IRA in terms of putting them on equal footing. And yes, we don't dispute that at all. That was a major change for their removal proceedings. And Congress explained what they were doing in the committee report, that they were changing certain aspects of the prior regime of this entry doctrine. They didn't say they were changing all aspects of it. And where they did address detention, they said they were restating the prior provision that provided bond for those who were unlawfully present in the country. Before we get to that legislative history in the House reports, and focusing only on the text in the way that the new statute is structured, you mentioned the B1A, the expedited removal, detention provision, and the removal processes that apply to the expedited cases. And there, Congress did distinguish between arriving aliens and those who are here but inadmissible. And it strikes me as odd that Congress wouldn't use the same sort of language in B2A if the point was to distinguish between arriving aliens and those who are already present in the interior but here illegally and thus are inadmissible. Why wouldn't they use the same sort of language? Because B1A refers to aliens who are arriving in the United States or are inadmissible for any of the other purposes. In other words, who are already here but inadmissible for certain purposes. Those are subject to expedited removal. So there's a distinction in the expedited removal statute. Congress refers to the two classes of aliens. And it doesn't use that same arriving language in B2A. Yes, Your Honor. We think that if Congress had used arriving, it might have been overbroad. Arriving alien could also refer to someone who was a stowaway, and Congress did not want to allow a stowaway to be subject to removal proceedings. Right, but there's a separate exclusion for that class of aliens in B1. Yes, Your Honor. And there are other arriving noncitizens that Congress would not want to be swept up into 1225B2 like returning lawful permanent residents. And that's dealt with in a separate statute. Yes, Your Honor. But I think this reflects that in using the terms applicant for admission and seeking admission, Congress was being intentional about wanting to exclude people who are not applicants for admission who might nevertheless be seeking admission. For instance, think of not only the stowaway but someone seeking preclearance, going through their preclearance process, but they were also excluding people who are not applicants for admission. Oh, sorry. I'm sorry. People who are not seeking admission who might be applicants for admission, and that includes returning lawful permanent residents and people like petitioner who are not at a port of entry or seeking authorized entry into the country. So by using both of those terms, they're each doing separate work in 1225B2 to exclude groups that Congress did not want swept in. And I'll emphasize that it's only petitioners interpretation that gives meaning to both of those terms. The government basically is asking you to ignore the surplusage created by seeking admission. They don't have an explanation for what work that phrase is doing there. And we know that Congress, we start from the presumption that when they use different terms, they refer to different meanings. And there are parts of the statute where Congress referred to applicant for admission without any qualifiers. For instance, Judge Sykes, you referenced putting the burden on applicants for admission and their removal proceedings. There's no qualifier there. It applies to all applicants for admission. However, we have other statutes like 1225B2 that refer to both applicants for admission and aliens seeking admission. So in order to give meaning to that term, it must reference some other activity. As the 11th Circuit explained, this refers to a present participle active ongoing condition that is different from the passive condition that applicant for admission imposes. If I can turn to the next textual argument that the government raises about 1225A3, this is for the government a linchpin in their argument, but we think it's actually consistent with our interpretation. So the statute reads that officers must inspect all aliens who are applicants for admission or otherwise seeking admission, readmission, or transit through the U.S. So in practical terms, it's telling officers you must inspect all applicants for admission as well as all aliens seeking admission, readmission, or transit. Now the government goes further to argue that or otherwise here somehow makes applicants for admission just a subset of seeking admission ignoring the rest of the sentence. But as the Supreme Court has explained, or otherwise can do other work. It depends on the context. And here we think that what or otherwise is doing is reflecting an overlap between the terms. So there are some applicants for admission who are seeking admission, and there are some who are not. And Judge Sykes, we were talking about returning lawful permanent residence. I think this is a very common example that illustrates the difference between these two terms. So returning lawful permanent residence is a green card holder. When they return from a trip abroad, they present at a port of entry for inspection. They are deemed an applicant for admission by 1225A1 because they're arriving, thus they must be inspected. However, because lawful permanent residence can generally travel freely in and out, the INA recognizes that even though they are at the border, they are not seeking admission unless one of special circumstances apply. I see I'm into my rebuttal time if I can finish this. I guess I'll just close by saying that returning lawful permanent residence is an applicant for admission, but not seeking admission. So this illustrates that you cannot subsume applicant for admission under the term seeking admission. Okay. Thank you, Ms. Goh. We'll see you again. And now we welcome to the podium Mr. Ensign. Good morning. May it please the Court, Drew Ensign, Deputy Assistant Attorney General for the United States. In the landmark 1996 Iowa statute, Congress specifically sought to end the differential and more favorable treatment given to aliens that unlawfully cross our borders and successfully make it into the interior of our country. As the Ninth Circuit has explained, Congress in Iowa sought to, quote, ensure that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings, end quote. One of the ways that Congress equalized treatment for unadmitted aliens was providing for mandatory detention pending removal for everyone, whether they had lawfully presented themselves at ports of entry or instead illegally barged past the United States borders. Congress did so in subsection A1 by deeming that all aliens who have not been admitted into the United States are deemed to be applicants for admission. And then that carries forward into the operative provisions. And as the Ninth Circuit has correctly recognized, when a person applies for something, they are necessarily seeking it. But if you're deemed to be an applicant for admission, right, that's a statutorily defined term. I think everyone in the courtroom agrees that Mr. Rojas is deemed an applicant for admission. But does that necessarily mean that statute aside, he has applied for or is seeking admission? I believe so, Your Honor. Congress specifically deemed as much, and that, you know, in a nutshell, is a legal fiction. And so legal fictions apply regardless of whether or not they match the facts on the ground. But the statute says that Mr. Rojas would be deemed an applicant for admission, and Congress chose to use those words, applicant for admission. And I think, to me, if we're talking about seeking admission, the question then becomes, is he seeking admission? I don't believe so, Your Honor. They deemed him to be an applicant for admission, which means that he must have an application. If Congress deemed him to be an applicant for admission, but there's no application anywhere in the statute, then I think you've effectively nullified the deeming. They've deemed him to be nothing, essentially. And I don't think their textual argument even works on their terms, for example. You know, they say that seeking admission is what triggers B-2, rather than whether or not you've been admitted. But they admit that mandatory detention under B-2 applies to people that are caught at the border, not presenting ports of entry, regardless of whether or not they're applying for anything at all. So even under their interpretation, by conceding that B-2 applies at the border, they're giving seeking admission some other reading. What they're trying to do is reconstruct the prior regime, where 1226A applied to the interior and 1225B-2 applied only at the border, but there's no textual basis. Not wholly, only for purposes of detention and the interpretation of B-2A. Yes, Your Honor, but certainly the way that they interpret applicant for admission is that it, and Judge Lagoa notes this in her dissent, it does no work anywhere in section 1225. You know, the applicant for admission under their reading simply has no effect anywhere all of 1225. You know, it's something quite extraordinary. And I think, you know, they certainly point out that it is different words, but, you know, as we say, doublet redundancy in a single sentence is a minor interpretive cost. Nullifying the reach of a deeming provision and cross an entire statutory section is not, as Judge Lagoa said. And, you know, beyond that, it simply does no work anywhere in 1225. So can a foreign national be in lawful status but not be admitted? Yes, Your Honor. A TPS holder would be an example of that. So what's to say that Mr. Rojas is, in fact, seeking admission? He's deemed an applicant for admission, and that means that different statutory provisions may apply to him, because that's a statutory regime. You're deeming something to be so. That doesn't, it doesn't follow to me that then every other meaning of that phrase would, or anything, you know, the legal fiction of deemed, admitted, and then you're saying, ah, he's deemed admitted, therefore he must be seeking admission. Well, Congress chose to use the word applicant for admission, and that is decided here because of that legal fiction. That doesn't necessarily mean that he's actually seeking admission. Well, I think two responses to that, Your Honor. First of all, by deeming him an applicant for admission and giving that meaning, that term its ordinary meaning, he has to have an application. And so under a petitioner's interpretation, there is no application. Congress's choice of word, you know, has no meaning. Its ordinary meaning is simply out the window. And second, even if I think you were writing on a blank slate as to that provision alone, A3 itself confirms the relationship between applicants for admission and seeking admission by its or otherwise. And as this court has said in the Cleaver case, the phrase or otherwise operates as a catch-all. The specific items that preceded are meant to be subsumed by what comes after the or otherwise. It's 914F3 at 482 to 83. And so as this court's decision in Cleaver recognizes that logical relationship between applicant for admission and seeking admission is defined by Congress itself. You know, I think one of the errors the Eleventh Circuit makes is by thinking that an applicant for admission is a defined term. Congress doesn't define it. It does give us some indication of what it means. It tells us two things about it, but it's not defined. There is no applicant for admission means X. Instead, it tells us two things that we need to know. It tells us all aliens that are physically present in the United States, regardless of whether or not at courts of entry or not, are applicants for admission. And through A3, it tells us the relationship between applicants for admission and those seeking admission. I agree with you that it's not in the definition section of the INA. But do you have a case that tells us that something can't be a statutorily defined term if it's not in the definition section and that there must be, in short, magic words that mean it's a definition versus the plain language here shall be deemed sufficient to construe it as a definition? That's certainly a petitioner's argument. Your Honor, not at my fingertips. There are certainly many cases that say where Congress doesn't define a term, courts give it its ordinary meaning. And I think that's what's controlling here. And the ordinary meaning for an applicant for admission is their point. No, but I'm saying, do you have a case that says this is not a definition because it's not in the definition section and because it doesn't have certain words the government says are missing from this sentence in B2? Not that granular, Your Honor. I think it's more the general principle that without something that says X means Y, then courts give terms its ordinary meaning without such a provision. And why does shall be deemed not mean X means Y again? It only means that some people must be applicants for admission. It doesn't purport to be exclusive. There could be other people that are applicants for admission. There could be people literally applying for admission that would also qualify. By deeming it, Congress means that all people within this category must be applicants for admission. But it leaves open the possibility that others may be as well. And so it's not a defined term, but Congress does tell us two things that are important about it. One, that petitioners here are applicants for admission. And two, the logical relationship between being an applicant for admission and seeking admission, which is that if you are the former, you're necessarily doing the latter. I think the Fifth and Eighth Circuits have correctly recognized that the plain meaning of 1225 requires affirmance here. Including otherwise, the Eleventh Circuit notably conceded that if the court's task ended with ordinary meaning, end quote, the government would prevail. But because there is no specific definition for applicant for admission, ordinary meaning is necessarily what needs to prevail here, because Congress has not provided a specific definition that would operate otherwise. And certainly, while there is seeking admission and applicant for admission, as Jennings itself recognizes, there's no canon of construction that forbids interpreting different words using different parts of the statute to mean roughly the same thing. And that's what we have here. It's a doublet. I think as well, Judge Murphy in the Sixth Circuit provides another answer as to what seeking admission could be doing here by pointing to subsection A-4, which allows you to withdraw admission. And if people invoke that provision to withdraw their application, they could be within a- To withdraw something they haven't submitted. Well, A-4, I think- How does this work functionally? I mean, there was no inspection here, right? And there is no inspection with unadmitted aliens who sneak into the country. They're just issued a notice to appear, right? No, I think that that is the result of the inspection. Inspection doesn't just take place at the border. Essentially, inspection is when you get caught. And when you get caught and issued a notice of appearance, that's part of, you know, if you had, when you were getting caught- Who's doing the catching here? There's not a warrant that is issued by the Department of Justice, right? Sometimes there may be, sometimes there's not. And sometimes they may not know if someone is a visa overstayer or a- I'm not talking about the people who were lawfully admitted. That category is excluded. We're talking about the unadmitted aliens, the deeming language, so far as I can tell, in A1 of 1225, simply declares that all unadmitted aliens who have not been formally admitted are treated as applicants for admission. That's a status. It's not an activity. It's- And so there is no, there is no real application. And so far as I can tell, there's really no inspection, even though A3 requires an inspection. There's no inspection in front of an immigration officer. It's just done on paper, basically. And once the immigration authorities have notice from perhaps a state official who has arrested someone on a traffic offense or something like that, they just issue a notice to appear saying this person is inadmissible. And, you know, the process kicks in from there. I think that that process of issuing them a notice to appear, you know, if the person in question at that point could convince the DHS officer that they were in fact lawfully in the country, that NTA would not, you know, it was certainly should not issue. Well, what happened? Does the immigrant issued an NTA appear before an immigration officer or go directly to an immigration judge? They're issued an NTA. Those can often be very, very far into the future. But, you know, it has- Because it's a notice to appear in front of the immigration courts, right? Right. Right. So there is no intervening inspection as would occur at a border by an immigration officer who's doing what 1225 tells the government to do. I'm not sure I agree, Your Honor, in that, you know, that it would be the same process at the border that you could be, you know, issued a notice to appear at a hearing if, for example, you go through expedited removal and are found to have a credible fear. The result of that would be an NTA. Right. But there's always an inspection by an immigration officer at the border for someone who's presenting for a lawful entry at the border. Right? Not necessarily, Your Honor. You know, people that are- certainly that would be correct for ports of entry. As to who apprehended you at the border, there may be varying answers to that, that more typically would be, you know, Border Patrol, but perhaps not exclusively. So it very well could be the case that it was apprehended by some other federal law enforcement, and then ultimately that leads to a DHS inspection process that generates an NTA. I think the process as to whether or not- that ascertains whether or not to issue the NTA is effectively that inspection process. So the immigration judge doesn't have to go through the process of doing the initial inspection that's already been done on paper? That's my understanding. For unadmitted aliens who are caught in the interior? That's my understanding, Your Honor. And I think that the, you know, the IJ then, you know, it's essentially the charging documents, and the charging document that's issued at the end of the inspection process, and then that triggers the IJ proceedings, which have their own character and procedures and all the things that attend to that. So the seeking admission language in the detention section, B-2, is essentially just redundant, and a carryover from the prior statute with the substitution of the word admission for entry? Is that fair? Excuse me, Your Honor. I just want to make sure I'm looking at the right- the same as you. I'm looking at B-2, the one that's at issue here. Yep. And is that the mandatory no bond detention statute that you're seeking authority to invoke for this massive class of immigrants? I don't think it's redundant, Your Honor. I think it is the process that will, you know, lead to detention under 1225B in each case. I'm sorry, can you say that again? That seeking admission language is doing some independent work there? Oh, sorry. I think it's one of two things. I think it can either simply be a doublet as Judge Legova recognized in the 11th Circuit, or as Judge Murphy recognized in A-4- or sorry, in his dissent. It may be covering the A-4 situation where you would be an applicant for admission, but if you affirmatively disavow your application, you are now not seeking admission, and it would be inappropriate to detain you in those circumstances since you're about- essentially because you're about to be returned, given your withdrawal under A-4. But why is that necessary if A-4 lets the immigrant withdraw the application? So why would the seeking admission qualifier be necessary? It may not be, strictly speaking, necessary. It may just be for avoidance of doubt. There are certainly belt and suspenders all over this. For example, there's a specific exclusion for stowaways, even though they would already be excluded already. Sure. And so I think you have Congress just being super sure, and- Well, that's a little implausible here because Congress wasn't super sure about funding this massive mandate of no bond detention. It didn't fund it at all. And so we have to kind of make sense of what Congress didn't do, as well as what it did do. If this new language in B-2 really means what you say it means, then we'd expect to see some funding attached to this. And ORIRA was adopted in connection with a massive appropriations bill, wasn't it? It was an omnibus. There was no funding for this. Your Honor, in terms of that, the transition provision, I think the Fifth Circuit has the best discussion of this, and I think there's a couple of things there. One is that transition population, that was a known population that was going to have to be transferred immediately, whereas the population that would be affected by the applicant for admission detention provision is a rolling one that would be gradual over time. Sure, it might have pointed to I believe two or four million aliens, Petitioner said, but you're not going to encounter those overnight. That's going to take quite a bit of time. And certainly that could be addressed through future funding, through future detention. And frankly, if detention was exceeded, there might be the possibility of using parole under 1182 to address that as well. That's certainly something that the Biden administration did quite a bit of, for example. And so there may be any number of reasons that Congress did it that way, and I think, as the Fifth Circuit recognized, you shouldn't read too much into it, and you certainly shouldn't trump the plain text of the statute based on it. Could I touch on, get your views on mootness? Again, the supplemental filings seem to focus on the disagreement of the parties on this question of statutory interpretation that we've been talking about. But we need to be able to ensure ourselves that a habeas judgment is going to provide relief here. Do you see Mr. Rojas, I mean, the Sixth Circuit kind of treated a similar situation as a reprieve from detention. Is there any additional restraint on liberty that Mr. Rojas has that he wouldn't have if he were released on bond from the immigration judge? Not on that, Your Honor, but certainly as to the mootness question, I'll break roll for a moment and say that I agree with everything the petitioner's counsel said. And I'll just add a couple things. One, we agree with them that once this goes up to the BIA, because it was based on the brief vacating of Hurtado, the BIA's decision is very likely to result in reinstatement of detention, and so this court decision will ultimately control the detention issue. I think the Supreme Court's decision in Knox is also pretty instructive on this, where a case is only moot if it's impossible to grant effective relief. And essentially when you have parallel proceedings and one of them is a moving target, it's never going to be impossible for you to grant effective relief as long as that other one continues to move. And so as long as there's uncertainty there as to how that's going to resolve the detention question, this court resolving the dispute between the parties concretely is going to be absolutely controlling, and hence it will control whether or not the government can re-detain him, and it's not moot under that scenario. So if I could just summarize your argument in a nutshell, it's that all applicants for admission are, by operation of law, seeking admission until they're not, by withdrawing the phantom application for admission. I certainly think that's our main point, and I think that's buttressed by A3 too, which tells the logical relationship between applicants for admission and seeking admission, that those applicants for admission necessarily are seeking admission as recognized by Congress itself in that provision. And how does the withdrawal happen functionally? Should an immigrant in this status want to self-deport, to use the colloquial term? It would depend on where they're at, certainly if they're at the border they might just walk back across. We're not talking about the folks at the border here, we're talking about everybody captured in the interior, that's the whole debate. Certainly, although that dividing line is also a messy issue that I think also supports the government's position because what's at the border is not too well defined. So it would depend on whether or not someone is before DHS or before NIJ. And so EOR that runs immigration proceedings does have some restrictions on your ability to withdraw. Basically, the concern I believe is that if you get too far into immigration proceedings and see the writing on the wall, they don't want to let you just provide an order of removal. Certainly within DHS there are not formal regs, but my understanding is that if you indicate that you're willing to self-deport, they are overwhelmingly likely to indulge that desire. And it's how I think that often operates in practice. So what does it mean to be before DHS? Maybe you could clarify that first. If you are essentially talking to DHS. So you've been caught in one of these sweeps, and it's your turn in front of whoever the DHS representative is to plead your case, I guess, for not being detained? For not being detained, whether or not you want to. The DHS officer would be primarily concerned with, first, are you lawfully in the country? And second, if not, what to do about that? And as to that second question, if you concede that you're not lawfully in the country, but say you would depart willingly, I don't believe there are specific regs on the issue, but my understanding is that DHS will typically go along with that desire. Certainly, I'm sure that the facts are myriad, or possible scenarios are myriad, and may lead to different outcomes. But you would tell them that you would draw your application for admission, and if they agree to that, they would arrange for you to self-remove. Your application for admission that you haven't submitted. But by operation of law, I think that A4 recognizes that it's gone. We're certainly operating in a statute that Congress has created some legal evictions as they apply, notwithstanding the fact that reality might be different than that. And who's administering this? Who's making the decision for the government about whether somebody has withdrawn the phantom application? It would depend on who you're essentially before. So if you're in front of an IJ, then it would be... Oh, no, that part I understand. If you've made it all the way to the immigration courts, you've been in the system for a bit, but what happens in the field? I mean, is it an ICE agent who's making this judgment on behalf of the government? Is it somebody else? It could be ICE. It could be CPB. It could be decided by the line officer. It might be elevated to a supervisor. And how is it documented? That I don't know offhand, Your Honor. I mean, it seems like this is a highly consequential step in the process. And I just want to make sure I'm understanding your answers to Judge Sykes. Are you saying that it's likely that if someone who doesn't have lawful status is in front of DHS, ICE, whoever is encountering them, and they just say, I want to leave. I'd like to self-deport. I'd like to leave the country. That's the end of it? Like, did you say okay? I mean, did I have to invoke the legal fiction to say I understand that I'm deemed an applicant for admission, but I haven't really applied for admission to the extent you think I have? I hereby withdraw it? I mean, I'm confused as to the answers to Judge Sykes' questions on what happens in reality in the interior when someone without lawful status is in front of a government official. So my understanding is when they would be in front of an official within DHS that it would then be up to them whether or not to accept the withdrawal of the application. But there may be strong reasons to do so. In particular, if someone has been in the country for a length of time, expedited removal is not going to be an option. So it would be Section 240 proceedings. Section 240 proceedings take an extraordinary amount of time. It was not uncommon for people to be issued NTAs that would have court dates that might be two or three years into the future. And certainly, DHS presented with someone that might be willing to voluntarily withdraw rather than putting the government to the intense and lengthy process of Section 240 proceedings might be willing to accept that offer. And in addition, from the person apprehended, there are benefits as well because with the final order of removal, now any attempt to go back into the United States is potentially a legal reentry. There are also other immigration benefits that you would be cut off from that you might be able to retain by invoking A4. And so there are things to be gained from both sides of that exchange that make it something that I believe does happen with some regularity. I unfortunately don't have numbers for you specifically. But there intuitively is something to be gained from both the government's perspective and the alien's perspective in that context. I see my time has expired, so I'm certainly happy to answer any questions. But... I think that's it, Mr. Ensign. Thank you so much. Thank you, Your Honors. Mr. Goh, we welcome you back to the podium. And we went into overtime with Mr. Ensign. So we'll give you your four minutes. Thank you, Your Honor. I hope to make five or six very quick points. First, applicant for admission is doing work in 1225. They are inspected under 1225A3. Some of them are subject to expedited removal under 1225B1. Some of them are subject to mandatory detention under 1225B2, those who are also seeking admission. So applicant for admission is a necessary but insufficient condition to trigger B2. Second, people who cross between ports of entry are seeking admission. This actually happens very frequently. We have families, large groups, who are prevented for whatever reason from going to the port of entry. So when they cross and immediately seek out Border Patrol, they are submitting to an inspection, and they are then at the threshold of entry as described in the residuum. So they're seeking admission there because they're seeking to undergo that process for an authorized entry. Third, we do have a term of R here, applicant for admission. So Jennings' language does not apply because it was referring to four proceedings and pending removal proceedings. These were words with ordinary meaning. But as the Sixth Circuit and other circuits have explained, applicant for admission here is not an applicant in any ordinary sense. Petitioner is not seeking admission. He is instead seeking lawful status, as Judge Kollar, you mentioned, is described in the Sanchez v. Mayorkas case. Fourth, Kleber does not apply. That's a different statute. The Eleventh Circuit explained how that statute has a different construction, a series of verbs, followed by a catch-all here. We have a term of art followed by a series of present participles. It doesn't make sense to read it as a catch-all there. Fifth, I heard a lot of discussion about 1225A4, the withdrawal provision. And there, as the Second Circuit explained, the government doesn't explain how somebody can withdraw an application that they have never submitted. And, in fact, if you look at the regulations, it explicitly says that petitioner cannot withdraw an application. This mechanism is not available to him. Instead, there's a separate set of provisions called voluntary departure. That's what applies to people who are in the country and allows for them to avoid removal proceedings. So this is consistent, again, with how the Supreme Court described these detention statutes. 1225B2 is about those seeking admission at the border. 1226 applies to those who are already in the country and that the government is trying to remove. These are two separate tracts with different systems in place. And, finally, I'd like to close with just addressing the elephant in the room, besides mandatory detention, and explain why our rule makes sense. So Congress, of course, is balancing a lot of considerations. So, yes, they wanted to tighten up on the border. They did that with expedited removal. That was an extraordinary tool to sweep in people who have been here for up to two years. But they were also thinking about the ties that people have. People who have been here for a long period of time, like Mr. Ceres Rojas. We're not challenging the government's authority to detain people or to put them into removal proceedings. All we are asking for here is a bond hearing where the immigration judge retains discretion to consider all these factors, like how long they've been here, their criminal history, their ties. And this is consistent with the longstanding scheme, as Jennings has talked about and the law professor's amicus brief goes into, differentiating between those stopped at the border, who the government just has less information about, and those who have become part of our communities and for whom the government just has much more information to make those bail assessments. But the statute does modify that old system in significant ways by requiring anyone in this status of being an applicant for admission, including unadmitted aliens apprehended inside this country, and requiring that they go through the inspection system. And the inspection system carries with it a detention provision as specified in 1225B, the statute at issue here, the provision at issue here. And the deeming language in the first paragraph of the statute seems to consider any unadmitted alien, not seems to, it does consider, construe, treat any unadmitted alien as an applicant for admission regardless of whether they are actively seeking admission. And it says there are no exceptions to that deeming language. It says for purposes of this chapter. It's hard to read that and to make sense of the inspection requirement and detention provisions as anything other than a status that is conferred on this class of non-citizens that subjects them to the detention regime in 1225 instead of the old detention regime of 1226 that applied to those who were apprehended not at the border but in the interior of the country. I mean, it's such broad sweeping language and a declaration of status for purposes of the entire statute. Yes, Your Honor. We agree that, again, Petitioner was deemed an applicant for admission by dint of his presence. It means that is his status in his removal proceedings. But Congress didn't say detain all applicants for admission. In 1225b-2, it said an alien who is an applicant for admission and then separately in a different clause, an alien seeking admission. We think you can't read it any other way but as a separate condition that Congress imposed. I'll also add that the government still has not explained how its interpretation squares with 1226. There must be some inadmissible people covered under 1226 to explain 1226c. And if you adopt the government's interpretation, you would be nullifying whole parts of that statute. And Petitioner's interpretation explains how we can give meaning to both of those statutes. I've seen well over my time, so we would respectfully ask the court to reverse the district court and declare that Mr. Sears-Rojas is eligible for bond. Thank you. Okay. Thanks to both the parties. And we will take the case under advisement.